**Case No. 23-13807**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

―――――――――――――――

Jeanne Weinstein, individually and on behalf of
all others similarly situated under 29 U.S.C. 216(b),
*Plaintiff – Appellant*,

v.

440 CORP. d/b/a The Ridge Great Steaks & Seafood and Stephen Campbell,
*Defendants – Appellees.*

―――――――――――――――

On Appeal from the United States District Court
for the Northern District of Georgia
No. 2:19-cv-00105

―――――――――――――――

## APPELLANTS' OPENING BRIEF

―――――――――――――――

Drew N. Herrmann
HERRMANN LAW, PLLC
801 Cherry St., Suite 2365
Fort Worth, TX 76102
Phone: (817) 479-9229
Fax: (817) 541-7457

*Attorney for Plaintiffs-Appellants*

**No. 23-13807**
***Jeanne Weinstein, et al. v. 440 Corp., et al.***

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, the undersigned counsel hereby discloses the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock:

1. Bell, Steven Duane (Opt-in Plaintiff/Appellant)

2. Bock, Denise (Opt-in Plaintiff/Appellant)

3. Bortz, Jusstina (Opt-in Plaintiff/Appellant)

4. Bowen, Jason (Opt-in Plaintiff/Appellant)

5. Burkett, Danielle (Opt-in Plaintiff/Appellant)

6. Burks, Nicole (Opt-in Plaintiff/Appellant)

7. Campbell, Stephen (Defendant-Appellee)

8. Cope, James (Opt-in Plaintiff/Appellant)

9. Corabi, Taryn (Opt-in Plaintiff/Appellant)

10. Corley, Madison (Opt-in Plaintiff/Appellant)

11. Crane, Jessica (Opt-in Plaintiff/Appellant)

12. Dermen, Stephanie (Opt-in Plaintiff/Appellant)

13. Gamble, Caitlin A. (Opt-in Plaintiff/Appellant)

14. Glenn, Kason (Opt-in Plaintiff/Appellant)

15. Gordon Rees Scully Mansukhani, LLP (Defendant-Appellee's Counsel)

16. Hanson, Thomas (Opt-in Plaintiff/Appellant)

17. Harvey, Marcol D. (Defendant-Appellee's Counsel)

18. Head, Andrew C. (Plaintiff's Counsel in District Court proceeding)

19. Herrmann, Drew N. (Appellant's Counsel)

20. Herrmann Law, PLLC (Appellant's Counsel)

21. Howie, Tamara (Opt-in Plaintiff/Appellant)

22. Hunter, Angela (Opt-in Plaintiff/Appellant)

23. Jorgensen, Brock (Opt-in Plaintiff/Appellant)

24. Mayer, Britteny (Opt-in Plaintiff/Appellant)

25. Moss, Brady (Opt-in Plaintiff/Appellant)

26. Nilsson, Mary Anna Katherine (Opt-in Plaintiff/Appellant)

27. Parsons, Kyle (Opt-in Plaintiff/Appellant)

28. Salerno, Vincenzo (Opt-in Plaintiff/Appellant)

29. Schreiman, Donald (Opt-in Plaintiff/Appellant)

30. Sherwood, Jodie (Opt-in Plaintiff/Appellant)

31. Shultz, Chad A. (Defendant-Appellee's Counsel)

32. Story, Honorable Richard w. (District Court Judge)

33. Wagoner, Mary (Opt-in Plaintiff/Appellant)

34. Watson, Tyler (Opt-in Plaintiff/Appellant)

35. Weinstein, Jeanne (Named Plaintiff-Appellant)

36. 440 Corp. d/b/a The Ridge Great Steaks and Seafood (Defendant-Appellee)

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument in this matter. Appellants respectfully submit that oral argument will provide the Court and counsel the opportunity to clarify the legal issues, the evidence, and help guide this appeal towards an appropriate disposition.

# TABLE OF CONTENTS

**Page(s)**

Certificate of Interested Persons and Corporate Disclosure Statement ...................1

Statement Regarding Oral Argument ...................................................................... i

Jurisdictional Statement...........................................................................................1

Statement of the Issues ........................................................................................... 2

Statement of the Case ..............................................................................................3

    I.      The Course of Proceedings and Dispositions in the Court
           Below..............................................................................................3

    II.     Statement of the Facts. ...............................................................5

          A.     Defendants paid Plaintiffs less than minimum wage
               and required them to contribute a portion of their
               tips to a tip pool. ........................................................5

          B.     Defendants' Tip Pool Operation.................................5

          C.     Defendants' procedure for collecting and storing
               the "extra" leftover tip pool money. ........................ 6

          D.     Ms. Richards did not distribute the "extra"
               leftover tip pool money. ............................................7

          E.     The server-managers did not distribute the
               "extra" leftover tip pool money............................... 8

          F.     The bartenders did not receive the "extra"
               leftover tip pool money. ............................................ 9

G.   Defendants' records do not show the "extra" leftover tip pool money was distributed to the bartenders or to any other customarily and regularly tipped employees. ....................................10

H.   Defendants used the tip pool to purchase flowers, pay kitchen workers, bouncers and a maintenance employee...................................................................10

III.   Standard of Review. ........................................................ 11

Summary of the Argument...................................................................12

Argument.............................................................................................14

I.   The FLSA's Minimum Wage and Tip Credit Provisions. .................14

A.   The Court erred in concluding Defendants complied with the tip credit because there is no evidence showing Defendants distributed the extra leftover tip pool money in compliance with the FLSA. ................................................................... 17

1.   There is no evidence that Defendants distributed the extra leftover tip pool money to the bartenders. ........................................... 20

2.   The server-managers did not distribute the extra leftover tip pool money to the bartenders.....................................................23

3.   The bartenders did not receive the extra leftover tip pool money. ...............................25

B.   The Court erred by ignoring the undisputed evidence establishing Defendants used the tip pool money to purchase flowers and to pay non-tipped employees..............................................................27

iii

1.     Defendants used the tip pool money to buy flowers. ................................................................27

2.     Defendants used the tip pool money to pay kitchen workers who are not customarily and regularly tipped employees. ......................................... 28

3.     Defendants used the tip pool money to pay bouncers who are not customarily and regularly tipped employees. ......................................... 28

C.     The Court erred by concluding that Defendants complied with the tip credit based on a lack of evidence. ....................................................................30

1.     Defendants failed to maintain complete and accurate records showing that the extra tips were distributed to the bartenders. ................................33

2.     The fact that the server-managers and Ms. Richards are the only people who had access to the safe is not evidence that the tips were distributed to customarily and regularly tipped employees. ......................................................36

3.     Defendants are not entitled to the tip credit regardless of whether Plaintiffs suffered economic harm as a result. ............................................38

Conclusion ................................................................................39

Certificate of Compliance ........................................................ 44

Certificate of Service ...............................................................45

# TABLE OF AUTHORITIES

## Cases

*A.L. v. Jackson Cty. Sch. Bd.*,
  652 F. App'x. 795 (11th Cir. 2016) .............................................. 11

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) ...............................................30, 34, 35

*Ash v. Sambodromo, LLC*,
  676 F. Supp. 2d 1360 (S.D. Fla. 2009)................................... 14, 16

*Auer v. Robbins*,
  519 U.S. 452, 137 L. Ed. 2d 79, 117 S. Ct. 905 (1997) ...................................34

*Barcellona v. Tiffany English Pub, Inc.*,
  597 F.2d 464 (5th Cir. 1979).................................................. 16, 33

*Beaudry v. Emperor's Gentleman's Club, Inc.*,
  No. 8:14-cv-02653-MSS-TGW, 2015 U.S. Dist. LEXIS 178020
  (M.D. Fla. Apr. 6, 2015) ................................................17

*Bingham v. Airport Limousine Serv.*,
  314 F. Supp. 565 (W.D. Ark. 1970)..........................................35

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ...............................................16

*Dalley v. CG RYC, LLC*,
  2018 U.S. Dist. LEXIS 150696, 2018 WL 7629048 (S.D. Fla.
  Aug. 31, 2018) .................................................14

*Delaney v. Geisha NYC, LLC*,
  261 F.R.D. 55 (S.D.N.Y. Sept. 22, 2009) ....................................17

*Donovan v. New Floridian Hotel, Inc.*,
  676 F.2d 468 (11th Cir. 1982) .................................................16

*Dybach v. Fla. Dep't of Corr.*,
  942 F.2d 1562 (11th Cir. 1991).................................................. 11

*Ettorre v. N.Y. Pizzeria, Inc.*,
    No. H-19-245, 2021 U.S. Dist. LEXIS 80483 (S.D. Tex. 2021) ...................35

*Ettorre v. Russos Westheimer, Inc.*,
    No. 21-20344, 2022 U.S. App. LEXIS 7295 (5th Cir. Mar. 18,
    2022) ........................................................................................................ 20

*Frank v. Fresh on the Square LLC*,
    No. 5:20-cv-372-Oc-30PRL, 2021 U.S. Dist. LEXIS 178426
    (M.D. Fla. 2021) ........................................................................................39

*Guillory v. PF&B Mgmt., LP*,
    No. H-11-4377, 2013 U.S. Dist. LEXIS 39484, 2013 WL 1181439
    (S.D. Tex. Feb. 27, 2013) ................................................................ 16, 17, 19

*Howard v. Second Chance Jai Alai LLC*,
    2016 WL 3349022 (M.D. Fla. June 16, 2016) .............................................17

*Kubiak v. S.W. Cowboy, Inc.*,
    164 F. Supp. 3d 1344 (M.D. Fla. 2016) ................................................ 15, 39

*Malivuk v. Ameripark, LLC*,
    694 F. App'x. 705 (11th Cir. 2017) ............................................................14

*Montano v. Montrose Rest. Assocs., Inc.*,
    800 F.3d 186 (5th Cir. 2015) ............................................................... 14, 29

*Myers v. Copper Cellar Corp.*,
    192 F.3d 546 (6th Cir. 1999) ......................................................................34

*Nail v. Shipp*,
    No. 17-00195-KD-B, 2019 U.S. Dist. LEXIS 132072 (S.D. Ala.
    Aug. 6, 2019) ...................................................................................... 16, 34

*Palacios v. Hartman & Tyner, Inc.*,
    No. 13-CIV-61541, 2014 U.S. Dist. LEXIS 172859 (S.D. Fla.
    Dec. 15, 2014) ......................................................................................15, 18

*Rosell v. VMSB, Ltd. Liab. Co.*,
    67 F.4th 1141 (11th Cir. 2023) .....................................................................1

*Roussell v. Brinker Int'l, Inc.*,
  441 F. App'x. 222 (5th Cir. 2011).......................................................... 18, 19

*Ruiz v. Sushi Thai*,
  No. 14 C 4090, 2016 U.S. Dist. LEXIS 160765 (N.D. Ill. 2016)..................35

*Shultz v. Hinojosa*,
  432 F.2d 259 (5th Cir. 1970)........................................................................33

*Stewart v. CUS Nashville, LLC*,
  No. 3:11-CV-342, 2011 U.S. Dist. LEXIS 69670, 2011 WL
  2600622 (M.D. Tenn. 2011) ........................................................................30

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) .....................................................................................34

*Wajcman v. Investment Corporation of Palm Beach*,
  No. 9:07-CV-80912, 2008 U.S. Dist. LEXIS 21939, 2008 WL
  783741 (S.D. Fla. Mar. 20, 2008) ...............................................................29

*Williams v. Bigtop Bingo, Inc.*,
  No. 3:20cv2377-TKW-HTC, 2021 U.S. Dist. LEXIS 267182
  (N.D. Fla. 2021)...........................................................................................15

**Statutes**

28 U.S.C. § 1291 ................................................................................................1

28 U.S.C. § 1331 ................................................................................................1

Fair Labor Standards Act,
  29 U.S.C. § 201 *et seq.*.........................................................................passim

**Rules**

29 C.F.R. § 531.54(c) ......................................................................................17

29 C.F.R. § 531.56(c) ......................................................................................35

29 C.F.R. § 531.59(b) ..................................................................................... 20

## Jurisdictional Statement

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The District Court had federal question subject matter jurisdiction because Plaintiff asserted claims under the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The District Court intended to dispose of all claims and parties and entered a final judgment. *See* [Doc. 176 at ECF p. 13] ("Based on the foregoing, the Court finds in favor of Defendants and hereby **ORDERS** that **JUDGMENT** be entered in favor of Defendants and against Plaintiffs."); [Doc. 177] (Judgment entered by Clerk); *cf. Rosell v. VMSB, Ltd. Liab. Co.*, 67 F.4th 1141, 1143 (11th Cir. 2023) ("Because the parties here attempted to use Rule 41(a) to dismiss a single count and not an entire lawsuit, a final judgment was never rendered. We thus lack jurisdiction to hear this appeal, so we dismiss it."). Because the District Court entered a final judgment, this Court has jurisdiction over this appeal.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred when it failed to consider evidence at summary judgment showing that Defendants used tips from the tip pool to pay bouncers?

2.    Whether the District Court erred in concluding that Defendants complied with the tip credit based on a finding that Defendants did not "retain any tips" for themselves?

3.    Whether there was any evidence from which the District Court could find that Defendants met their burden to establish that all tips from the tip pool were distributed to customarily and regularly tipped employees?

4.    Whether the District Court erred in concluding that Defendants complied with the tip credit despite the uncontroverted evidence that Defendants used the tip pool to pay bouncers, kitchen workers, and to purchase flowers?

## STATEMENT OF THE CASE

### I.    THE COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE COURT BELOW.

Plaintiff Jeanne Weinstein, a former server at The Ridge Great Steaks & Seafood ("The Ridge"), initiated this collective action on behalf of herself and a purported class of similarly situated former employees of The Ridge (together with Plaintiff Weinstein, "Plaintiffs") by filing a Collective Action Complaint on May 24, 2019. [Doc. 1]. Therein, Plaintiffs claimed Defendants violated the FLSA's minimum wage requirements, 29 U.S.C. § 206, by paying Plaintiffs less than $7.25 per hour. *Id*. Plaintiffs also alleged Defendants were not entitled to take a tip credit, an affirmative defense.

After nearly eighteen months of discovery, the parties moved for summary judgment. Defendants moved for summary judgment on the basis that Plaintiffs could not prevail on their minimum wage claim because Defendants were entitled to claim the FLSA's tip credit defense, 29 U.S.C. § 203(m)(2)(A)(ii). [Doc. 105]. Plaintiffs, in turn, moved for partial summary judgment on the basis that Defendants could not rely on the tip credit defense and whether Defendant Campbell was an employer. [Doc. 109].

Following oral argument, the Court issued an order granting in part and denying in part the parties' motions for summary judgment. [Doc. 136]. Relevant to

this appeal, the Court found that a material fact remained: whether Defendants' tip pool was lawfully distributed to employees who customarily and regularly received tips (specifically bartenders). [*Id.* at 32-33, 38]; *cf. Joint Pretrial Order*, [Doc. 150 at p. 6, Nos. 3-4] (Plaintiffs' list of legal issues to be tried); *Id.* [Doc. 150 at p. 7, Nos. 2-5] (Defendants' list of legal issues to be tried).

Thereafter, the case proceeded to a bench trial to resolve the issue of "[w]hether Defendants fully distributed the tip pool solely among customarily and regularly tipped employees?" [Doc. 150 at p. 7, No. 2] (Defendants' list of legal issues to be tried). After a one-day bench trial, the District Court found that Defendants had established compliance with the tip credit defense and thus entered judgment in favor of Defendants. *See Findings of Fact & Concl. of Law*, [Doc. 176]; *Final Judgment*, [Doc. 177].

## II.    STATEMENT OF THE FACTS.

### A.    Defendants paid Plaintiffs less than minimum wage and required them to contribute a portion of their tips to a tip pool.

In this case, there is no dispute that: "(i) Defendants employed Plaintiffs at all relevant times, [Doc. 8, at ¶¶ 8, 24]; (ii) Defendants paid servers $2.15/hour and claimed a tip credit of $5.10/hour (the difference between the wage paid to the servers and the $7.25/hour minimum wage established by 29 U.S.C. § 206), [Doc. 8, at ¶¶ 26-27]; or (iii) all tipped employees, including Plaintiffs, retained all tips other than a 3% portion of gross food sales that were contributed to the tip pool, [Doc. 113-1, at ¶ 10]." *Findings of Fact and Concl. of Law*, [Doc. 176 at p. 5].

### B.    Defendants' Tip Pool Operation.

Instead of receiving minimum wage, Defendants guaranteed their hostesses, food runners, and bussers a flat hourly wage of usually $10.00 per hour, which is comprised of $2.15 per hour paid by The Ridge and the remainder is paid from the tip pool money which is collected from the servers and bartenders each night. [Doc. 176 at p. 6]. In other words, the Ridge utilized a portion of the tips it took from the servers and bartenders to make up the difference between the amount The Ridge pays ($2.15) its hostesses, food runners, and bussers and the pre-determined flat hourly wage they receive (e.g., 10, $11, or $12 per hour). *Id.*; *see also* [Doc. 136 at p. 3].

At the heart of this case is what Defendants did with the "extra" leftover tip pool money—i.e., the tips leftover in the tip pool after the support staff were paid their guaranteed flat hourly wages.

### C. Defendants' procedure for collecting and storing the "extra" leftover tip pool money.

At the end of each shift, the server-manager on duty was responsible for collecting the extra tips and placing them in an envelope in The Ridge's safe. To complete this process, server-managers would complete two documents. [Doc. 136 at p. 3].

First, there was a Cash Out Record ("COR") for server-managers to complete at the end of each shift. The Cash Out Record recorded (i) each server and bartender who worked that shift; (ii) their gross sales; (iii) the amount they were required to contribute to the tip pool (i.e. 3% of sales); (iv) the cumulative total of all tips collected and placed into the tip pool. [Doc. 136 at p. 3].

Second, there was a Support Staff Tipshare grid ("SST"), which recorded (i) the per hour amount each support staff person was to receive from the tip pool per hour; (ii) the hours each support staff person worked; (iv) the product of the amount each support staff person was paid from the tip pool based on the hours they worked multiplied by their guaranteed flat hourly tip share wage. *See* [Trial Tr. at 78:15-82:2]

(Richards testifying about calculating distributions from the tip pool, which resulted in extra leftover tip pool money).

The server-manager would then place the extra leftover tips in an envelope and placed it in the safe. [Trial Tr. at 80:16-21; 81:17-21]. The only individuals who could access the safe where the extra leftover tip pool money was kept were Ms. Richards and the server-managers. [Trial Tr. 142:18-143:1].

### D. Ms. Richards did not distribute the "extra" leftover tip pool money.

"Richards is not, however, responsible for distributing those extra tips to the bartenders." [Doc. 176 at p. 9]; *see also* [Trial Tr. at 81:17-82:2; 94:10-12; 95:7-17]. However, there was no written policy for how the extra leftover tips were to be handled or even distributed. [Trial Tr. at 41:23-42:6; 95:1-17]; *cf.* [Trial Tr. at 109:19-110:15; 122:13-123:5]

Instead, after the SSTs were completed, Ms. Richards sometimes went back and added handwritten notes to the SSTs, purportedly instructing the server-managers to pay the extra to the bartenders. *See e.g.,* [Trial Tr. at 97:3-98:9] (testifying that "'Pay bar extra please!'" was instruction to Jeanne Weinstein for her to pay the bar, "but she didn't, obviously, or maybe she did. I mean, I don't know. I mean, there's no way – it's not checked off that she did."); [Trial Tr. at 99:1-3 ("**Q.**

Do you know if Ms. Weinstein saw the instructions to 'Pay bar extra please'? **A.** I have no idea.").

Yet, there are multiple instances where Ms. Richards admits that server-managers were not even instructed to distribute the extra leftover tip pool money. [Trial Tr. at 115:21-116:7; 121:17-122:12]. Ms. Richards does not know, nor can she point to any evidence showing the server-managers distributed the extra leftover tips to anyone, much less to customarily and regularly tipped employees. *See* [Trial Tr. at 106:3-5] ("**Q.** Do you know whether any of this money was allocated to the bar? **A.** No."); *Id.* [Trial Tr. at 109:13-18; 124:23-125:1; 125:7-121; 131:8-132:4].

Ultimately, Ms. Richards does not know whether any of the extra leftover tips were ever distributed to the bartenders. [Trial Tr. at 104:19-24; 106:3-5; 106:13-19; 112:1-19; 120:14-21; 121:10-16; 126:13-23]; *Id.* [Trial Tr. at 119:7-20] (. . . "[w]hat they did with [the extra leftover tip pool] money was always a mystery to me.").

### E. The server-managers did not distribute the "extra" leftover tip pool money.

"Plaintiff Weinstein testified that she [as a server-manager] never hand delivered extra tips to the bartenders." [Doc. 176 at p. 9]; *see also* [Trial Tr. at 17:15-22; 17:25-18; 22:4-7; 22:16-20; 34:1-14; 50:1-52:3; 52:11-53:22; 54:3-19; 55:4-18; 60:9-61:5].

Opt-in Plaintiff Bowen also testified that he, as a server-manager, never distributed the extra tips to the bartenders. *See Bowen Depo. Tr.*, [Doc. 124 at 98-131 (18:16-20; 19:13-20:1; 28:3-30:11; 62:20-25)]; (Bowen testifying he did not distribute the extra leftover tips and instead testifying the extra tips disappeared from the safe); cf. [Trial Tr. at 91:13-16] (Richards testifying that Bowen worked as a server-manager and a bartender); *see also* [Doc. 176 at p 8, n. 6] (noting that Opt-in Plaintiff Bowen also worked as a server-manager).

### F.   The bartenders did not receive the "extra" leftover tip pool money.

"Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone." [Doc. 176 at pp. 10]; *see also* [Trial Tr. at 63:24-64:2] (Crane testifying she worked "two to sometimes three shifts as a bartender and never received any extra tip out in any position I worked, whether it was bartender or a server."); *Id.* [Trial Tr. at 67:9; 67:13-14; 70:4-15].

In addition to Opt-in Plaintiff Crane, Opt-in Plaintiff Schreiman also worked as a bartender and testified that he did not receive any of the extra leftover tip pool money, rather the money simply disappeared. *See Schreiman Depo Tr.,* [Doc. 125 at pp. 4-12, 12:25-13:6; 15:24-25; 23:19-24:2; 25:20-26:7]; *cf.* [Trial Tr. at 90:25-16] (Richards testifying that Schreiman, Crane, and Bowen all worked as bartenders).

### G.    Defendants' records do not show the "extra" leftover tip pool money was distributed to the bartenders or to any other customarily and regularly tipped employees.

In addition, Defendants failed to maintain complete and accurate records, which, as the Court found, made it impossible to "track the extra tips from the safe to their destination." [Doc. 176 at p. 10]. Ms. Richards testified that Defendants' records do not show the bartenders were paid the extra leftover tip pool money. *See* [Trial Tr. at 104:2-7; 105:3-7].

In other words, Defendants do not have any evidence—no testimony and no documents—to support the conclusion that the extra leftover tip pool money was distributed to the bartenders. *See* [Trial Tr. at 104:19-24; 106:3-5; 106:13-19; 112:1-19; 120:14-21; 121:10-16; 126:13-23]; *Id.* [Trial Tr. at 119:7-20] (Richards testifying . . . "[w]hat they did with [the extra leftover tip pool] money was always a mystery to me."); *cf.* [Trial Tr. at 50:10-51:1; 51:22-52:3; 53:1-22; 54:3-19; 55:12-18; 56:21-57:11; 58:18-24; 60:9-24].

### H.    Defendants used the tip pool to purchase flowers, pay kitchen workers, bouncers and a maintenance employee.

Defendants used the tip pool to purchase flowers. [Trial Tr. at 128:1-13] (Richards testifying that tip money was used to purchase flowers). Furthermore, Defendants used the tip pool to pay a kitchen worker. [Trial Tr. at 127:3-12] (Richards testifying that tip pool money was distributed to pay "Donny" a kitchen

worker). Defendants also used the tip pool to pay bouncers. *See Pl's Statement of Facts,* [Doc. 109-2 at p. 6, SOF ¶ 17] (citing *Def's Resp. to Pls' Interrog.*, [Doc. 109-3 at pp. 54-56, at Interrog. No. 7] ("Persons in the Miscellaneous job classification performed miscellaneous duties. They included bouncers and DJ's.")) (emphasis added). In fact, the tip pool was used to pay "John" who, as Ms. Richards testified, was responsible for keeping the girls safe and doing maintenance work around the restaurant. [Trial Tr. at Doc. 116:18-117:19] (Richards testifying that the extra was paid to "John" the "floor guy that helped on weekends keep the girls safe when they were closing. He hung around. He did maintenance.").

## III.   STANDARD OF REVIEW.

The Court reviews findings of fact for clear error and legal conclusions *de novo*. *A.L. v. Jackson Cty. Sch. Bd.*, 652 F. App'x. 795, 795 (11th Cir. 2016) (citing *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991)) ("We [the *Dybach* Court] review such questions *de novo* to the extent they involve application of legal principles to established facts, and for clear error to the extent they involve an inquiry that is essentially factual . . .").

## SUMMARY OF THE ARGUMENT

There is no evidence—no documents and no testimony from any witnesses—that Defendants distributed the extra leftover tip pool money to anyone, much less the bartenders. Defendants failed to point to any evidence showing that the extra leftover tip pool money was distributed among customarily and regularly tipped employees. Simply put, the lack of evidence is fatal to Defendants' tip credit defense—without evidence Defendants cannot, and did not, meet their burden to prove that the tip pool was fully distributed "among employees who customarily and regularly receive tips."

In fact, Defendants' bookkeeper, Ms. Richards, testified to her own befuddlement about what happened to the extra leftover tip pool money – "[w]hat they did with money was always a mystery to me." [Trial Transcript at 119:17]; *Id.* at 119:7-20]. The Court was similarly befuddled by the mystery shrouding the whereabouts of the extra leftover tip pool money. Indeed, the Court's findings highlight the lack of evidence regarding who, if anyone, received the extra leftover tip pool money. *See e.g.,* [Doc. 176 at pp. 9-10] ("Plaintiff Weinstein testified that she never hand delivered extra tips to the bartenders. Richards also testified that she never hand delivered extra tips to the bartenders. And Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone. So,

12

it is unclear who was ultimately responsible for distributing the extra tips to the bartenders and who fulfilled that responsibility.").

Yet, despite the lack of evidence showing what happened to the extra leftover tip pool money—much less evidence that it was distributed to customarily and regularly tipped employees—the Court still concluded that Defendants had met their burden to prove that all tips contributed to the tip pool (including the extra leftover tip pool money) was distributed to customarily and regularly tipped employees.

Notwithstanding Defendants' lack of evidence to support their burden of proof, Plaintiffs offered additional evidence cementing Defendants' failure to put forth evidence to show that the tip pool was fully distributed among tipped employees. First, Plaintiffs offered testimony from Plaintiff Weinstein and Opt-in Bowen, who both testified that they, as server-managers, never distributed the extra leftover tips to the bartenders or anyone else. Second, Plaintiffs also offered unrefuted testimony from individuals who testified that they, as bartenders, never received any of the extra leftover tip pool money. Third, the record establishes that Defendants cannot say or point to any documents showing that the extra leftover tip pool money was distributed to the bartenders (or anyone else).

A<span style="font-variant:small-caps">RGUMENT</span>

## I.    THE FLSA'S MINIMUM WAGE AND TIP CREDIT PROVISIONS.

Under Section 206 of the FLSA, employers are generally required to pay employees at least $7.25 per hour. *See* 29 U.S.C. § 206(a)(1)(C). However, "[t]he FLSA contains an exception that permits employers to pay less than the general minimum wage - $2.13 per hour — to a 'tipped employee' as long as the employee's tips make up the difference between the $2.13 minimum wage and the general minimum wage." *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 188 (5th Cir. 2015) (citing 29 U.S.C. § 203(m)); *see also* 29 U.S.C. § 206 (minimum wage); 29 U.S.C. § 203(m) (tip credit defense to payment of subminimum wages); *Dalley v. CG RYC, LLC*, 2018 U.S. Dist. LEXIS 150696, 2018 WL 7629048, *2 (S.D. Fla. Aug. 31, 2018) ("Employers can meet [the minimum wage] obligation through a base wage or by a tip credit equal to the difference between the base wage and the statutorily required minimum wage."). "An employer who utilizes an employee's hourly tips to reach the minimum hourly wage due the employee is said to take a 'tip credit.'" *Malivuk v. Ameripark, LLC*, 694 F. App'x. 705, 706-07 (11th Cir. 2017). "The [employer] bears the burden of establishing that it is entitled to claim the 'tip credit.'" *Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1369 (S.D. Fla. 2009).

"To meet this burden, the employer 'must show that (1) the employee at issue is a tipped employee, (2) the employer informed the employee of the tip-credit provision, and (3) the employee retained all tips [s]he received, except when an employer requires an employee to participate in a tip pool with other employees who customarily and regularly receive tips. If an employer fails to satisfy any of these preconditions, the employer may not claim the tip credit, regardless of whether the employee suffered actual economic harm as a result.'" *Williams v. Bigtop Bingo, Inc.*, No. 3:20cv2377-TKW-HTC, 2021 U.S. Dist. LEXIS 267182, at *31 (N.D. Fla. 2021) (quoting *Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1354-55 (M.D. Fla. 2016)) (footnote and citation omitted).

Here, this appeal turns on the third requirement—whether Defendants can prove that all tip pool money, including the tip money Plaintiffs contributed to the tip pool, was fully distributed to employees who were customarily and regularly tipped employees. *See* 29 U.S.C. § 203(m) (employer must show that "all tips received by [a tipped] employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."); *see also Palacios v. Hartman & Tyner, Inc.*, No. 13-CIV-61541, 2014 U.S. Dist. LEXIS 172859, at *10 (S.D. Fla. Dec. 15, 2014) ("If the tip pool is distributed among non-tipped employees, then the tips are

not 'retained by the employee,' and the tip credit is invalid.") (citing *Guillory v. PF&B Mgmt., LP*, No. H-11-4377, 2013 U.S. Dist. LEXIS 39484, 2013 WL 1181439, at *5 (S.D. Tex. Feb. 27, 2013) *report and recommendation adopted*, 2013 WL 1182061 (S.D. Tex. Mar. 20, 2013)).

In addition, the tip credit is an *affirmative defense*—the burden to prove compliant utilization of the tip credit is squarely on the employer. *See, e.g.*, *Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1369 (S.D. Fla. 2009) (*citing Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979))[1] ("The burden of showing entitlement to the use of a tip credit lies with the employer."); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 474 (11th Cir. 1982) (employer has burden of proving compliance with section 203(m)); *Nail v. Shipp*, No. 17-00195-KD-B, 2019 U.S. Dist. LEXIS 132072, at *26 (S.D. Ala. Aug. 6, 2019) (granting summary judgment against employer-restaurant where employer failed to put forth sufficient evidence to substantiate compliance with the tip credit).

In sum, to prevail on their tip credit defense under Section 203(m) of the FLSA, Defendants were required to prove that they fully distributed all tips from their tip pool (including all the "extra") to employees who were customarily and

---

[1]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit prior to October 1, 1981.

regularly tipped employees. *See e.g.,* 29 U.S.C. § 203(m); 29 C.F.R. § 531.54(c) ("The employer may require an employee for whom the employer takes a tip credit to contribute tips to a tip pool *only if it is limited to employees who customarily and regularly receive tips.*") (emphasis added); *See also Beaudry v. Emperor's Gentleman's Club, Inc.*, No. 8:14-cv-02653-MSS-TGW, 2015 U.S. Dist. LEXIS 178020, at *2 (M.D. Fla. Apr. 6, 2015) (citing *Delaney v. Geisha NYC, LLC*, 261 F.R.D. 55, 58 (S.D.N.Y. Sept. 22, 2009) ("If the tip pool includes employees who do not customarily and regularly receive tips, the employer must pay them the full minimum wage.")).

### A. The Court erred in concluding Defendants complied with the tip credit because there is no evidence showing Defendants distributed the extra leftover tip pool money in compliance with the FLSA.

Section 203(m)(2)(A)(ii) precludes employers from requiring tipped employees to contribute to mandatory tip pools that include employees who do not "customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A)(ii). "If an *employer* cannot show that the tip pool was distributed solely among customarily and regularly tipped employees, the employer cannot take a tip credit and must pay its employees the full minimum wage under the FLSA.'" *Guillory*, 2013 U.S. Dist. LEXIS 39484, at *5 (emphasis added); *Howard v. Second Chance Jai Alai LLC*, 2016 WL 3349022, at *6 (M.D. Fla. June 16, 2016) ("If tipped employees are required to

17

participate in a tip pool with any employee who does not customarily receive tips, then the tip pool is invalid and the employer is not permitted to take a 'tip credit.'").

Here, Defendants simply failed to meet their "burden to prove [they] operated a legal tip pool." *Roussell v. Brinker Int'l, Inc.*, 441 Fed. Appx. 222, 230 (5th Cir. 2011) (holding employer "had the burden to prove it operated a legal tip pool"). More specifically, Defendants failed to point to show that all tips contributed to their tip pool, including the extra leftover tips, were distributed solely among employees who were customarily and regularly tipped. Notwithstanding Defendants' lack of evidence and failure to meet their burden of proof, the Court concluded that Defendants were entitled to the tip credit defense because "Defendants never retained any of the extra tips at issue." [Doc. 176 at p. 10]; *see also id.* ("the Court finds that Defendants did not retain any of the extra tips that were supposed to be distributed to the bartenders."). Contrary to the Court's conclusion, a finding that Defendants did not affirmatively "retain" any of the tip pool money for themselves is insufficient to conclude Defendants complied with the FLSA's tip credit.

The Court's conclusion is erroneous for several reasons. For example, Plaintiffs were <u>not</u> required to prove how or where the "extra" tip pool money went. *See e.g., Palacios v. Hartman & Tyner, Inc.*, No. 13-CIV-61541, 2014 U.S. Dist. LEXIS 172859, at *10 (S.D. Fla. 2014) (holding if employer-defendant cannot prove its tip

pool was fully distributed solely among customarily and regularly tipped employees, "then the tips are not 'retained by the employee,' and the tip credit is invalid.") (citing *Guillory v. PF&B Mgmt., LP*, No. H-11-4377, 2013 U.S. Dist. LEXIS 39484, 2013 WL 1181439, at \*5 (S.D. Tex. 2013) *report and recommendation adopted*, No. H-11-4377, 2013 U.S. Dist. LEXIS 38434, 2013 WL 1182061 (S.D. Tex. 2013) (citations omitted)). Instead, the tip credit is an affirmative defense and Defendants were required to prove, by a preponderance of the evidence, that the tip pool was fully distributed among customarily and regularly tipped employees.

In addition, the tip credit requires Defendants to establish, by a preponderance of the evidence, that the tip pool was fully distributed "among employees who customarily and regularly receive tips." *See* 29 U.S.C. § 203(m); *see also Roussell v. Brinker Int'l, Inc.*, 441 F. App'x. 222, 225 (5th Cir. 2011) ("Employers may not avail themselves of the sub-minimum wage unless 'all tips received by [a tipped] employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.'") (quoting 29 U.S.C. § 203(m)); *Cf.* [Doc. 176 at p. 12] (stating "the sole legal issue before the Court at trial boiled down to whether Defendants could prove, by a preponderance of the evidence, that they, as employers, never retained any portion of the tip pool funds for themselves."); *Id.* at

p. 5 (identifying the issue as "whether Defendants unlawfully kept any of the tip pool funds for themselves . . . .").

In other words, the Court was required to find that all tips contributed to Defendants' tip pool, including the extra leftover tips, were fully distributed solely among customarily and regularly tipped employees. *See Ettorre v. Russos Westheimer, Inc.*, No. 21-20344, 2022 U.S. App. LEXIS 7295, at *6 (5th Cir. Mar. 18, 2022) (the tip credit requires the employer to prove, among other things, that "all tips received must be retained by the employee except for a tip pooling arrangement limited to employees who customarily and regularly receive tips, and that the tip credit shall not apply to any employee who has not been informed of all of these requirements.") (citing § 203(m); 29 C.F.R. § 531.59(b)). Because Defendants failed to produce any evidence of where the extra tip pool money went—much less evidence showing it was distributed to customarily and regularly tipped employees—the Court erred in concluding Defendants met their burden to establish compliance with the tip credit.

### 1. There is no evidence that Defendants distributed the extra leftover tip pool money to the bartenders.

Here, there is no evidence that the "extra" leftover tip pool money was distributed to anyone, much less customarily and regularly tipped employees. There is simply no evidence that the extra leftover tip pool money was distributed to the bartenders—no testimony that anyone distributed the money, no payroll records

showing it was distributed, no testimony from bartenders saying they received it, and no documents or payroll records or other physical evidence showing that the extra tip pool money was given to the bartenders.

Indeed, Defendants' entire case rested on their supposition that the server-managers were *supposed* to distribute the "extra" to the bartenders. However, the only two server-managers to testify, Plaintiff Weinstein and Opt-in Plaintiff Bowen, both testified that they, as server-managers, never distributed the extra leftover tip pool money to anyone (much less the bartenders). *Bowen Depo. Tr.*, [Doc. 124 at 18:16-20; 19:13-20:1; 28:3-30:11] (Bowen testifying he did not distribute the extra leftover tips and instead testifying the extra tips disappeared from the safe); *cf.* [Trial Tr. at 91:13-16] (Richards testifying that Bowen worked as a server-manager and a bartender); *see also* [Doc. 176 at p 8, n. 6] (noting that Opt-in Plaintiff Bowen also worked as a server-manager).

Moreover, Ms. Richards conceded that she failed to even "allocate" the extra to anyone, much less actually distribute the extra the bartenders. [Trial Tr. at 130:20-24]; [Trial Tr. at 131:18-132:4]. On other occasions, due to Defendants' failure to maintain complete and accurate records, Ms. Richards testified that she did not know whether there were any extra tips leftover in the tip pool to even be allocated.

*See e.g.,* [Trial Tr. at 106:3-5] ("**Q.** Do you know whether any of this money was allocated to the bar? **A.** No.").

However, even on those occasions where Ms. Richards did purportedly "allocate" the extra to the bartenders, Ms. Richards does not know, and has no way of knowing, whether the extra leftover tip pool money was distributed to the bartenders or anyone else. *See e.g.,* [Trial Tr. at 97:3-98:9] (testifying that "'Pay bar extra please!'" was instruction to Jeanne Weinstein for her to pay the bar, "but she didn't, obviously, or maybe she did. I mean, I don't know. I mean, there's no way – it's not checked off that she did."); [Trial Tr. at 99:1-3] ("**Q.** Do you know if Ms. Weinstein saw the instructions to 'Pay bar extra please'? **A.** I have no idea."); *see also* [Trial Tr. at 104:19-24; 106:3-5; 106:13-19; 112:1-19; 120:14-21; 121:10-16; 126:13-23]; *cf.* [Doc. 176 at p. 9] ("Plaintiff Weinstein testified that she [as a server-manager] never hand delivered extra tips to the bartenders."); [Doc. 176 at pp. 10] ("Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone.")

The record is simply devoid of any evidence that the extra leftover tip pool money was always distributed to the bartenders or any other customarily and regularly tipped employees. *See, e.g.*, [Doc. 176 at p. 10] (finding "[t]he documentary evidence introduced at trial does not track the extra tips from the safe to their

destination[,]" which "prevent[ed] the Court from accurately tracing each dollar from the extra tips to the bartenders."); [Trial Tr. at 104:19-24; 106:3-5; 106:13-19; 112:1-19; 120:14-21; 121:10-16; 126:13-23]; *Id.* [Trial Tr. at 119:7-20] (Richards testifying . . . "[w]hat they did with [the extra leftover tip pool] money was always a mystery to me."); *cf.* [Trial Tr. at 50:10-51:1; 51:22-52:3; 53:1-22; 54:3-19; 55:12-18; 56:21-57:11; 58:18-24; 60:9-24].

Simply put, there is no evidence—no testimony and no documents—showing that Defendants distributed the extra leftover tip pool money to the bartenders, or to any other customarily and regularly tipped employees. Therefore, Defendants failed to offer evidence in support of an element of their tip credit defense—an affirmative defense to the payment of minimum wage under the FLSA.

### 2.    The server-managers did not distribute the extra leftover tip pool money to the bartenders.

There is no dispute that the server-managers never delivered the extra leftover tip pool money to the bartenders (or any other customarily and regularly tipped employee). First, Plaintiffs offered undisputed testimony from two server-managers, Ms. Weinstein and Mr. Bowen, who both unequivocally testified that they never distributed the extra tips [Doc. 176 at p. 9] (finding "Plaintiff Weinstein testified that she [as the server-manager] never hand delivered extra tips to the bartenders."); o the bartenders or any other customarily and regularly tipped employee. *Bowen Depo.*

23

*Tr.*, [Doc. 124 at p. 103 (18:16-20; 19:13-20:1; 28:3-30:11)]; *cf.* [Trial Tr. at 91:13-16] (testifying that Bowen worked as a server-manager and a bartender); *see also* [Doc. 176 at p 8, n. 6] (noting that Opt-in Plaintiff Bowen also worked as a server-manager); [Trial Tr. at 50:10-51:1; 51:22-52:3; 53:1-22; 54:3-19; 55:12-18; 56:21-57:11; 58:18-24; 60:9-24].

Moreover, Ms. Richards "testified that she never hand delivered extra tips to the bartenders." [Doc. 176 at p. 9]. In fact, there is no evidence—no testimony and no documents—that *anyone* distributed the extra leftover tips to the bartenders or any other customarily and regularly tipped employees. The Court did not disagree and even found "it is unclear who was ultimately responsible for distributing the extra tips to the bartenders and who fulfilled that responsibility." [Doc. 176 at p. 10]. In fact, the bartenders who testified all testified to never receiving any of the extra leftover tip pool money. Therefore, as the Court found, not only is there no evidence showing who (if anyone) distributed the extra tips to the bartenders, but there is also no evidence that the bartenders received the extra leftover tip pool money. In fact, Plaintiffs offered undisputed evidence supporting the opposite conclusion—the extra leftover tip pool money was in fact ***not*** distributed to, nor received by, the bartenders.

### 3. The bartenders did not receive the extra leftover tip pool money.

Although the Court found that "Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone[,]" the Court somehow still concluded that "the extra tips were properly distributed to The Ridge's bartenders." [Doc. 176 at pp. 10-11]. In addition to Opt-In Plaintiff Crane, Opt-in Plaintiff Schreiman also testified worked as a bartender and never received any of the extra leftover tip pool money. *Schreiman Depo Tr.,* [Doc. 125 at p. 8 (12:25-13:6; 15:24-25; 23:19-24:2; 25:20-26:7]; *cf.* [Trial Tr. at 90:25-16] (testifying that Schreiman, Crane, and Bowen all worked as bartenders). The testimony that the bartenders did not receive the extra leftover tip pool money is undisputed—Defendants did not offer testimony from any bartenders nor anyone else stating the bartenders received the extra leftover tip pool money. *Cf.* [Doc. 176 at p. 10] (finding "Richards [] testified that she never hand delivered extra tips to the bartenders. And Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone.").

In addition, "Plaintiff Weinstein testified that she [, as a server-manager,] never hand delivered extra tips to the bartenders." [Doc. 176 at p. 9]. In addition, Opt-in Plaintiff Bowen also testified that he, as a server-manager, never distributed, nor was he told to distribute, the extra leftover tips to the bartenders (or anyone else).

*Bowen Depo. Tr.*, [Doc. 124 at p. 103 (18:16-20; 19:13-20:1; 28:3-30:11)]; *cf.* [Trial Tr. at 91:13-16] (testifying that Bowen worked as a server-manager and a bartender); *see also* [Doc. 176 at p 8, n. 6] (noting that Opt-in Plaintiff Bowen also worked as a server-manager).

In addition to the undisputed testimony that server-managers did not distribute the extra to the bartenders and the bartenders testifying they did not receive any of the extra tips, the Court also found that Defendants failed to maintain complete and accurate records, which "prevent[ed] the Court from accurately tracing each dollar from the extra tips to the bartenders." [Doc. 176 at p. 10]. Yet, because the Court found it could eliminate "*certain* destinations from the realm of possibilities[,]" the Court concluded "Defendants did not retain any of the extra tips that were supposed to be distributed to the bartenders." [Doc. 176 at pp. 10-11]. However, merely eliminating *certain* destinations from the realm of possibilities is not sufficient to find that the extra leftover tip pool money was lawfully distributed to customarily and regularly tipped employees.

In fact, as discussed below, the Court ignored the affirmative undisputed evidence establishing that the tip pool money was in fact ***not*** distributed to the bartenders. *See, e.g.,* [Trial Tr. at 128:1-13] (Richards testifying that tip money was used to purchase flowers); [Trial Tr. at 127:3-12] (Richards testifying that tip pool

money was distributed to pay "Donny" a kitchen worker); [Trial Tr. at Doc. 116:18-117:19] (Richards testifying that the extra was paid to "John" the "floor guy that helped on weekends keep the girls safe when they were closing. He hung around. He did maintenance.").

### B. The Court erred by ignoring the undisputed evidence establishing Defendants used the tip pool money to purchase flowers and to pay non-tipped employees.

Because Defendants failed to put forth evidence that all tips from the tip pool were used to pay customarily and regularly tipped employees, Plaintiffs were not required to put forth any evidence showing the tip pool was *not* distributed to pay customarily and regularly tipped employees. Despite having no burden to do so, Plaintiffs presented undisputed evidence establishing that Defendants used tips from the tip pool for an unlawful purpose.

#### 1.    Defendants used the tip pool money to buy flowers.

The Court ignored the undisputed evidence that Defendants used the extra leftover tips, for example, to purchase flowers. [Trial Tr. at 128:1-13] (Richards testifying that tip money was used to purchase flowers); [Trial Tr. at 142:4-17] (same). This undisputed evidence showing that Defendants used the tip pool money to purchase flowers bellies "the Court[']s conclu[sion] that the extra tips at issue *could* only have gone to tipped employees." [Doc. 176 at p. 11] (emphasis added)

(footnote omitted).[2] Therefore, the Court's conclusion that the extra tips *could* only have gone to tipped employees is contrary to the undisputed evidence.

### 2. Defendants used the tip pool money to pay kitchen workers who are not customarily and regularly tipped employees.

The Court also ignored undisputed evidence showing on another occasion that Defendants distributed the tip pool money to pay a kitchen worker (a job position that is not eligible to receive tips). *See* [Trial Tr. at 127:3-12] (Richards testifying that tip pool money was distributed to pay "Donny" a kitchen worker). Therefore, for this additional reason, the Court's conclusion that "the extra tips *could* only have gone to tipped employees" is directly undermined by the undisputed evidence.

### 3. Defendants used the tip pool money to pay bouncers who are not customarily and regularly tipped employees.

The Court also refused to consider evidence that The Ridge used tips to pay bouncers who are not tipped employees. *Compare,* [Doc. 136 at p. 27], *with* [Doc. 109-2 at p. 6 ¶ 17]. On summary judgment, Plaintiffs pointed to evidence—Defendants' own sworn statement—that The Ridge used tips to pay bouncers, who are not customarily and regularly tipped employees. [Doc. 109-2 at p. 6 ¶ 17] ("The Ridge also distributed a portion of the tip pool to bouncers.") (citing Doc. 109-3 at

---

[2]    Plaintiffs address the Court's footnote *infra*.

pp. 54-56]; *see also,* [Doc. 122-2 at pp. 7-8, ¶ 17]. However, the Court ignored Plaintiffs' evidence and instead found on summary judgment as a matter of law "the Ridge did not hire bouncers or pay them with tip pool funds during the relevant period of time." [Doc. 136 at p. 27] (citing Doc. 113-6, at ⁑ 16).

Despite the Court's ruling on summary judgment regarding this issue,[3] the uncontradicted evidence at trial established that Defendants did in fact use the tip pool to pay someone who performed bouncer and maintenance duties—a nontipped employee. *See* [Trial Tr. at Doc. 116:18-117:19] (Richards testifying that the extra was paid to "John" the "floor guy that helped on weekends keep the girls safe when they were closing. He hung around. He did maintenance.").

Therefore, Defendants' use of the tip pool to compensate bouncers (including John who also did maintenance) invalidates the tip pool. *See Wajcman v. Investment Corporation of Palm Beach*, No. 9:07-CV-80912, 2008 U.S. Dist. LEXIS 21939, 2008 WL 783741, at *4 (S.D. Fla. Mar. 20, 2008) (observing that, "[w]hile the [bouncer's] job might entail significant customer interface, it does not involve the exchange of pleasantries or provision of personal services that ordinarily evokes tipping generosity"); *Montano v. Montrose Rest. Assocs.*, 800 F.3d 186, 195 (5th Cir. 2015)

---

[3]    It is unclear whether the Court granted summary judgment on this issue in favor of Defendants.

(concurring opinion) ("A nightclub's bouncer may have to "interact" (a clear understatement) with customers, and yet it's virtually unknown for anybody to tip him after picking themselves up off the pavement."); *Stewart v. CUS Nashville, LLC*, No. 3:11-CV-342, 2011 U.S. Dist. LEXIS 69670, 2011 WL 2600622, at *3 n.2 (M.D. Tenn. 2011) ("[T]he court is not convinced that a bouncer who had largely unpleasant, confrontational, or hostile interactions with customers would be eligible for a tip pool."). By using Plaintiffs' tips to compensate bouncers, Defendants invalidated the tip credit as a matter of law.

### C. The Court erred by concluding that Defendants complied with the tip credit based on a lack of evidence.

The Court's findings, including findings about a lack of evidence, are contrary to the Court's conclusion that "Defendants did not retain any portion of the extra tips, and that the extra tips were properly distributed to The Ridge's bartenders." [Doc. 176 at p. 11]. The court stated that, "If the tip pool generates excess funds (or "extra tips"), The Ridge requires those extra tips to be distributed to the bartenders who worked that night's shift." [Doc. 176 at pp. 6-7]. However, there was no testimony that this was even a policy, much less something that The Ridge "require[d]" it.

Although the Court found, "the CORs were not always timely or fully completed at the end of each shift", the Court failed to consider *Mt. Clemens*. [Doc.

176 at p. 8]. In addition, without the CORs, there is simply no evidence at all how much would have been contributed to the the tip pool on those nights, and therefore no way for Defendants to show that all tips were distributed.

As the Court correctly found, Richards did not "distribut[e] those extra tips to the bartenders." [Doc. 176 at p. 9]. The server-managers were allegedly "supposed" to distribute the extra, but Ms. Richards could not say whether they did or not. In fact, the only evidence in the record is that the server-managers did not distribute the extra. Ms. Weinstein and Mr. Bowen, who were both server-managers, testified that they never distributed the extra because they were never told to distribute the extra. Regardless of whether they were told to do so, the only evidence in the record is that the server-managers never distributed the extra leftover tip pool money to anyone, much less to the bartenders. [Dkt. 176 at p. 9]; [Trial Tr. at 50:10-51:1; 51:22-52:3; 53:1-22; 54:3-19; 55:12-18; 56:21-57:11; 58:18-24; 60:9-24]; *see also Bowen Depo,* [Doc. 124 at p. 103 (18:16-20; 19:13-20:1; 28:3-30:11)].

Moreover, Ms. Crane testified that she, as a bartender, never received any "extra." [Doc. 176 at p. 10] ("And Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone."); *see also* [Trial Tr. at 63:22-64:2; 67:3-14; 67:22-68:9; and 70:4-15]. Indeed, the Court found that "it is

unclear who was ultimately responsible for distributing the extra tips to the bartenders and who fulfilled that responsibility." [Doc. 176 at p. 10].

Defendants also failed to maintain complete and accurate records, which as the Court found, makes it impossible to "track the extra tips from the safe to their destination." [Doc. 176 at p. 10]. Nevertheless, the Court found that it could "eliminat[e] *certain* destinations from the realm of possibilities" and therefore, the Court found, this was sufficient to conclude that Defendants met their burden of proving the tips were actually distributed to customarily and regularly tipped employees. [Doc. 176 at p. 10] (emphasis added). However, simply eliminating *certain* destinations from the realm of possibilities is not evidence that the tips were lawfully distributed. In reaching this conclusion, the Court eliminated the following possibilities: (1) Ms. Richards did not keep any of the extra nor did she reserve any for The Ridge; and (2) Mr. Campbell did not have access to the safe and did not keep any of the extra. [Doc. 176 at p. 10]. Thus, the Court found, by eliminating these possible destinations from the realm of possibilities, "Defendants did not retain any of the extra tips that were supposed to be distributed to the bartenders." [Doc. 176 at pp. 10-11]. In reaching this conclusion, the Court has improperly shifted the burden onto the Plaintiffs, requiring Plaintiffs to prove what happened to the extra leftover tips.

In addition, the Court's conclusion is fundamentally flawed because: (1) it improperly inverts the burden of proof because it assumes, in the absence of any evidence to the contrary, that Defendants did not retain any of the extra tips; (2) it fails to consider and thus eliminate other certain possible destinations, including that Defendants used the extra tip pool money to pay rent, pay the kitchen staff, purchase inventory, or any other number of possible destinations; (3) it is not supported by the evidence or the Court's findings that Defendants lacked evidence to show that the extra leftover tip pool money was distributed to the bartenders; and (4) it "defaults" to the incorrect conclusion based on an absence of evidence showing where the extra leftover tip money went.

### 1. Defendants failed to maintain complete and accurate records showing that the extra tips were distributed to the bartenders.

Although Defendants have the burden to prove compliance with the tip credit, because Defendants failed to maintain complete and accurate records, Defendants also have the burden to disprove claims that the employees were improperly compensated. *See, e.g.*, *Shultz v. Hinojosa*, 432 F.2d 259, 261 (5th Cir. 1970) (holding that where employer fails to keep records, burden is on employer to "disprove" evidence that the employees were improperly compensated); *Barcellona v. Tiffany English Pub, Inc*., 597 F.2d 464, 467 (5th Cir. 1979); *Myers v. Copper Cellar Corp*., 192

F.3d 546, 549 n.4 (6th Cir. 1999) ("[A]n employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption.") (citing *Auer v. Robbins*, 519 U.S. 452, 462, 137 L. Ed. 2d 79, 117 S. Ct. 905 (1997)).

Under longstanding Supreme Court precedent, courts must apply a relaxed standard in cases where an employer fails to maintain proper and adequate records burden. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946) ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA]."); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) (holding the "remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making" the burden of proving uncompensated work "an impossible hurdle for the employee.") (quoting *Mt. Clemens*, 328 U.S. at 687-88).

Here, Defendants lack any evidence that could possibly substantiate a conclusion that the extra leftover tip pool money was distributed to the bartenders in compliance with the tip credit. Numerous courts have reached a similar conclusion—unsubstantiated assertions are insufficient to show compliance with the tip credit. *See, e.g., Nail*, 2019 U.S. Dist. LEXIS 132072, at *26 (finding defendant's

unsubstantiated assertions without any substantiating evidence were insufficient to show compliance with the tip credit); *Ettorre v. N.Y. Pizzeria, Inc.*, No. H-19-245, 2021 U.S. Dist. LEXIS 80483, at *5 (S.D. Tex. 2021) (granting summary judgment on defendant's tip credit defense where defendant "improperly claimed the tip credit, erroneously kept part of the tips, and failed to keep adequate records, [the defendant-restaurant], is liable under the Fair Labor Standards Act for its minimum wage violations."); *Ruiz v. Sushi Thai*, No. 14 C 4090, 2016 U.S. Dist. LEXIS 160765, at *13-15 (N.D. Ill. 2016) (holding defendant's mere assertions "without the necessary evidentiary support" are insufficient to establish compliance with the tip credit); *Bingham v. Airport Limousine Serv.*, 314 F. Supp. 565, 572 (W.D. Ark. 1970) (finding violations of FLSA minimum wage where "no witness on behalf of defendant was able to aid the court with documentary evidence of individual tip receipts. In any event, it seems quite clear that the court may not infer that plaintiffs are tipped employees merely because they are or were part of a group which has a record of receiving more than $20 a month in tips.") (citing 29 C.F.R. § 531.56(c)).

Therefore, the Court erred because it failed to consider Defendants' failure to maintain complete and accurate records as required by the FLSA and *Mt. Clemens*. In failing to consider Defendants' record-keeping violations, the Court erred by finding that Defendants' unsubstantiated assertions, which lacked substantiating

evidence, supported the conclusion that Defendants had met their burden of establishing compliance the tip credit. Indeed, even Ms. Richards conceded, "[w]hat they did with [the extra leftover tip pool] money was always a mystery to me." [Trial Transcript at 119:17]; *Id.* at 119:7-20.

### 2. The fact that the server-managers and Ms. Richards are the only people who had access to the safe is not evidence that the tips were distributed to customarily and regularly tipped employees.

Despite the lack of evidence, the Court concluded "that the extra tips at issue could only have gone to tipped employees." [Doc. 176 at p. 11] (footnote omitted).[4] To support this conclusion, the Court contends Plaintiffs' counsel conceded this during closing arguments.[5] However, instead of conceding the entire case, during closing arguments, counsel for Plaintiffs merely agreed that *other than* Ms. Richards, only tipped employees had "access" to the extra tip pool monies. [Trial Tr. at 157:18-158:1]. Indeed, this is *not*, as the Court found, a concession that all tips "could only have gone to tipped employees."

First, the Court's question and Plaintiffs' counsel's answer both made clear that Ms. Richards (who is not a tipped employee) had access to the safe where the

---

[4]     Plaintiffs address the Court's footnote *infra*.

[5]     In other words, the Court concluded that Plaintiffs' counsel conceded the entire case during closing arguments.

tip pool money was kept. Second, Plaintiffs' counsel's answer merely reflected the facts established during trial: only the server-managers and Ms. Richards had access to the safe where the tip pool money was kept. This certainly does not lead to the conclusion—or even an inference—that the extra tip money could only have gone to tipped employees. Indeed, notwithstanding the fact that Ms. Richards, who is *not* a tipped employee, had "access" to the tip pool money, the fact that server-managers had "access" to the safe, does not lend itself to even an inference that the tip pool money was distributed to customarily and regularly tipped employees.

In fact, the server-managers all testified that they never distributed any extra to the bartenders and the bartenders testified they did not receive it. The server-managers testified that they did not distribute the extra to *anyone* and there is no evidence or testimony that anyone ever received the extra. Instead, the server-managers testified that the envelope of extra tip pool money simply disappeared from the safe—and there is simply no evidence about who took it or where it went. Moreover, Ms. Richards testified that she did not distribute the extra to the bartenders (or anyone else). Instead, Ms. Richards merely testified that the server-managers were "supposed" to distribute the extra to the bartenders but confirmed that she did not know whether it was distributed to the bartenders (or anyone else). *See e.g.,* [Trial Tr. at 119:7-20] (. . . "[w]hat they did with [the extra leftover tip pool]

money was always a mystery to me."); [Trial Tr. at 97:3-98:9] (testifying that "'Pay bar extra please!'" was instruction to Jeanne Weinstein for her to pay the bar, "but she didn't, obviously, or maybe she did. I mean, I don't know. I mean, there's no way – it's not checked off that she did."); [Trial Tr. at 81:17-82:2; 95:1-17; 104:19-24; 106:3-5; 106:13-19; 112:1-19; 120:14-21; 121:10-16; 126:13-23].

Simply put, the complete lack of *any* evidence regarding what happened to the extra leftover tip pool money is definitely not evidence, and does not support the Court's finding, that the tip pool money was distributed to the bartenders (or any other customarily and regularly tipped employee).

### 3. Defendants are not entitled to the tip credit regardless of whether Plaintiffs suffered economic harm as a result.

Moreover, any support the Court found in the deposition testimony as stated in the Court's footnote no. 9, does not support the Court's conclusion. [Doc. 176 at p. 11, n. 9] ("that the deposition testimony offered into evidence establishes that all tipped employees received all tips they were legally entitled to.").

First, whether or not tipped employees testified that they received all tips they were legally entitled to—a legal conclusion at best—is irrelevant. Here, it is undisputed that Plaintiffs did not retain all tips because they were required to contribute a portion of their tips to a tip pool. Therefore, because there is no dispute that Plaintiffs contributed a portion of their tips to a tip pool, the sole issue to be

decided is whether Defendants have evidence to show that all tip monies contributed to the tip pool were distributed to employees who are customarily and regularly tipped employees.

Second, Plaintiffs are not required to show—and it is irrelevant—whether they suffered economic harm. *See Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1355 (M.D. Fla. 2016) ("If an employer fails to satisfy any of these preconditions, the employer may not claim the tip credit, regardless of whether the employee suffered actual economic harm as a result."). In other words, because Defendants only paid Plaintiffs $2.15 per hour, Defendants must show they complied with the tip credit or they must pay Plaintiffs the "full minimum wage for the hours [they] worked." *See Frank v. Fresh on the Square LLC*, No. 5:20-cv-372-Oc-30PRL, 2021 U.S. Dist. LEXIS 178426, at *8 (M.D. Fla. 2021) (citing *Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1355 (M.D. Fla. 2016)).

## CONCLUSION

The District Court's conclusion is not only unsupported by the evidence, but it is legally deficient to conclude that Defendants met their burden of proof because "Defendants did not retain any of the extra tips that were supposed to be distributed to the bartenders."

First, the District Court failed to find that Defendants had any evidence showing that the extra leftover tip pool money was distributed to customarily and regularly tipped employees. Instead, the District Court merely found that Defendants did not retain any of the extra tips for themselves. However, this conclusion is legally deficient because even if Defendants did not retain the extra leftover tips for themselves, such a finding is insufficient to conclude that Defendants carried their burden to show that the tip pool (including the extra leftover tips) was fully distributed among customarily and regularly tipped employees.

Second, the District Court's conclusion is not supported by the evidence and is contradicted by its own findings. As the District Court found, Richards did not "distribut[e] those extra tips to the bartenders." [Doc. 176 at p. 9]. Instead, the server managers were responsible for distributing the extra tips. However, the District Court found "Plaintiff Weinstein testified that she [as a server-manager] never hand delivered extra tips to the bartenders." [Doc. 176 at p. 9]; see also [Trial Tr. at 17:15-22; 17:25-18; 22:4-7; 22:16-20; 34:1-14; 50:1-52:3; 52:11-53:22; 54:3-19; 55:4-18; 60:9-61:5].Opt-in Plaintiff Bowen also testified that he, as a server-manager, never distributed the extra tips to the bartenders. *See* Bowen Depo. Tr., [Doc. 124 at 98-131 (18:16-20; 19:13-20:1; 28:3-30:11; 62:20-25)]; (Bowen testifying he did not

distribute the extra leftover tips and instead testifying the extra tips disappeared from the safe); *cf.* [Trial Tr. at 91:13-16] (Richards testifying that Bowen worked as a server-manager and a bartender); *see also* [Doc. 176 at p 8, n. 6] (noting that Opt-in Plaintiff Bowen also worked as a server-manager).

Moreover, the District Court found "Opt-In Plaintiff Jessica Crane testified that she, as a bartender, never received extra tips in cash from anyone." [Doc. 176 at p. 10]; *see also* [Trial Tr. at 63:24-64:2] (Crane testifying she worked "two to sometimes three shifts as a bartender and never received any extra tip out in any position I worked, whether it was bartender or a server."); *Id.* [Trial Tr. at 67:9; 67:13-14; 70:4-15].

In addition, the Court found, "[t]he documentary evidence introduced at trial does not track the extra tips from the safe to their destination[,]" which "prevent[ed] the Court from accurately tracing each dollar from the extra tips to the bartenders." [Doc. 176 at p. 10]; *see also* [Trial Tr. at 104:19-24; 106:3-5; 106:13-19; 112:1-19; 120:14-21; 121:10-16; 126:13-23]; *Id.* [Trial Tr. at 119:7-20] (Richards testifying . . . "[w]hat they did with [the extra leftover tip pool] money was always a mystery to me.").

Despite the lack of evidence, the District Court still found in favor of Defendants—the party with the burden of proof.

The District Court's conclusion is not only unsupported by the evidence, but the District Court also failed to consider the uncontroverted evidence establishing that Defendants did not distribute the tips to customarily and regularly tipped employees. Indeed, there was uncontroverted evidence presented at trial establishing that Defendants used the tips to pay bouncers, kitchen employees, and to purchase flowers.

Because the District Court's conclusion is legally deficient and unsupported by the evidence, Plaintiffs respectfully request this Court reverse the District Court and render judgment in favor of Plaintiffs based on Defendants' failure to present evidence supporting their tip credit defense. Plaintiffs further request that this matter be remanded to the District Court to determine the appropriate amount of damages to award Plaintiffs, including whether Defendants' violations were willful or based on good faith.

**Dated: February 28, 2024**       Respectfully submitted,


By: /s/ Drew N. Herrmann
     **Drew N. Herrmann**
     Texas Bar No. 24086523
     drew@herrmannlaw.com
     **HERRMANN LAW, PLLC**
     801 Cherry St., Suite 2365
     Fort Worth, Texas 76102
     Phone: (817) 479-9229

     *Attorney for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this Brief complies with the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Equity 14-point font. I further certify that this motion complies with the length limitations set forth in Rule 32(a)(7) because it contains 9,352 words, as counted by Microsoft Word, excluding the items that may be excluded under Rule 32(a)(7)(B)(iii).

/s/ Drew N. Herrmann
Drew N. Herrmann

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to any filing users who may have entered an appearance in this action.

/s/ Drew N. Herrmann
Drew N. Herrmann